JULIA M. JAYNE, State Bar No. 202753
Jayne Law Group, P.C.
483 9th Street, Suite 200
Oakland, CA 94607
Telephone: 415-623-3600
Facsimile: 415-623-3605
julia@jaynelawgroup.com

Attorney for Defendant JONATHAN CHANG

CHRISTOPHER J. CANNON, State Bar No. 88034
MATTHEW A. LAWS, State Bar No. 273697
Sugarman & Cannon
737 Tehama Street, No. 3
San Francisco, CA 94103
Telephone: 415-362-6252
Facsimile: 415-362-6431
chris@sugarmanandcannon.com

Attorneys for Defendant WEILIN CHANG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> JONATHAN CHANG & WEILIN CHANG , <br><br> Defendants. | Case No. 16-cr-00047 EJD <br><br> DEFENDANTS' NOTICE OF MOTION AND MOTION IN LIMINE NO. 3 TO EXCLUDE PORTIONS OF AGENT KIKUGAWA'S REPORT AND CONCLUSIONS; REQUEST FOR DAUBERT HEARING <br><br> Pretrial Conference: July 31, 2019 <br> Time: 1:30 p.m. <br> Dept: Courtroom 1, 5th Floor <br> Judge: Hon. Edward J. Davila <br><br> Date Filed: July 3, 2019 <br><br> Trial Date: August 13, 2019 |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on July 31, 2019 or as soon thereafter as this motion may be

heard, in the courtroom of the Honorable Edward J. Davila, United States District Court Judge,

DEFENDANTS Jonathan Chang and Weilin Chang, will and do jointly make this motion *in limine* for an

1  order excluding argument, testimony, certain exhibits, and particular assumptions and conclusions by

2  FBI Agent Carlene Kikugawa on the following bases: (1) significant portions of her report and

3  conclusions combine and conflate HOCA, Inc. and HOCA, LLC in a misleading and inaccurate way; (2)

4  parts of Agent Kikugawa's report inappropriately include assumed facts or commentary on her personal

5  beliefs about the facts; (3) Agent Kikugawa's application of the Lowest Intermediate Balance Method is

6  invalid, as her application is not scientifically recognized because she has manufactured the

7  commingling; and (4) her conclusions about the source of funds for properties lack appropriate tracing

8  and jump to assumptions without an actual tracing.

9       This motion is based upon this Notice, the Federal Rules of Criminal Procedure, the

10  accompanying memorandum of points and authorities, the exhibits served and filed herewith, on the

11  records and files in this action, all applicable law, and any such further argument and evidence as may be

12  presented prior to and during the hearing on this motion.

13

14

15  Dated: July 11, 2019                    Respectfully submitted,

16                                          _____/s/_____

17                                          Julia Jayne
                                            Christopher J. Cannon
                                            Matthew A. Laws

18                                          Attorneys for Defendants Jonathan & Weilin Chang

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................1

II.     STATEMENT OF RELEVANT FACTS............................................................2

III.    ARGUMENT .......................................................................................................2

   A.   Legal Standard .............................................................................................2

   B.   Agent Kikugawa's Methodology is Unreliable and Misleading and Therefore, Inherently Unreliable Under Rule 702 and Daubert. .......................................................4

        1. If the Court Declines to Exclude Agent Kikugawa's Testimony and Her Application of the LIBM, a *Daubert* Hearing is Warranted..................................................7

   C.   Agent Kikugawa's Factual Assertions in the FIR are Matters for the Jury and the Inclusion of Hearsay Assertions Violates the Defendants' Right to Due Process and to Confront and Cross Examine the Evidence Against Them. ...............................................7

   D.   Agent Kikugawa Cannot Speculate as to the Source of Funds for the Property Purchases .10

   E.   All Evidence Relating to Personal Property Purchases is Irrelevant and Should Be Excluded..............................................................................12

        1. The Five Properties Are Not Relevant and Should be Excluded as the Subject of Evidence or Testimony.........................................................................12

        2. The Government Cannot Speculate as to the Source of Funds for the Property Purchases ..............................................................................13

IV.     CONCLUSION ................................................................................13

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769 (10th Cir. 2009) ...............................4

*Claar v. Burlington R.R.*, 29 F.3d 499 (9th Cir. 1994) ...............................................................3

*Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) ...............................................................3

*Crawford v. Washington*, 541 U.S. 36 (2004). ...............................................................7

*Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) ...............................................3, 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995). ...............................4

*Dodge v. Cotter Corp.*, 203 F.3d  1190 (10th Cir. 2000) ...............................................3, 4

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ...............................................................7

*General Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...............................................................3

*Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000)...........................4

*In re Paoli R.R. Yard  PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)...............................................5

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ...............................................................3

*Mitchell v. Gencorp Inc.*, 165 F.3d 778 (10th Cir.1999)...............................................5

*Ohio v. Roberts*, 448 U.S. 56 (1980).....................................................................................7

*Republic Supply Co. of California v. Richfield Oil Co. of California*, 79 F.2d 375 (9th Cir. 1935) ...........5

*United States v. Cerna*, No. CR 08-0730 WHA, 2010 U.S. Dist. LEXIS 146687 (N.D. Cal. Dec. 17, 2010) ...............................................................7

*United States v. Dukagjini*, 326 F.3d 45 (2nd Cir. 2003) ...............................................................8

*United States v. Farrell*, 563 F.3d 364 (8th Cir. 2009)...............................................................8

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ...............................................................3

*United States v. Honolulu Plantation Co.*, 182 F.2d 172 (9th Cir. 1950)...............................6

*United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981)...............................................................8

*United States v. Mejia,* 545 F.3d 179 (2d Cir. 2008) ...............................................................7

*United States v. Miner*, 774 F.3d 336 (6th Cir. 2014) ...............................................................9

<u>**Rules**</u>

Fed. R. Evid 704(b)...............................................................9

Fed. R. Evid. 401 ......................................................................................................................12

Fed. R. Evid. 403 ...................................................................................................................4, 12

Fed. R. Evid. 702 ...............................................................................................................2, 3, 9

Fed. R. Evid. 703 ...................................................................................................................7, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

FBI Agent Carlene Kikugawa prepared a Financial Investigative Report ("FIR") pursuant to Fed. R. Evid. 702. The report defines its primary objectives as analyzing bank records to determine "The Source and Use of Funds for HOCA, LLC, HOCA, Inc., and HOCCC; The Source of Funds utilized by Subjects and Affiliates to purchase real and personal properties;" and to provide an unspecified "additional analysis as needed." This "additional analysis" appears to be Agent Kikugawa's conclusions as to facts based on hearsay reports she has reviewed and has no place in a Financial Investigative Report.

The FIR was accompanied by a number of exhibits. Some of the analysis in the FIR is based on a very fundamental misunderstanding of the HOC entities and allowed to stand, creates an incredibly misleading and disingenuous picture for the jury. Agent Kikugawa lumps together HOCA, Inc. and HOCA, LLC in much of her analysis when these are two fundamentally different entities that cannot be conflated: the LLC is a for-profit limited liability company that operates on many levels and was used by the Changs and even Cher Wang's companies as a business account. The INC is a non-profit, limited by the restrictions placed on any 501(c)(3) entity – and its assets do not belong to Jonathan Chang. Its activities are limited to church and ministry-related purposes and its outflows are related to expenses and donations. The INC accepted donations from Panda and FHL, while LLC accepted a $3 million loan from S3G. It is deceptively misleading for Agent Kikugawa – a purported financial expert – to combine the two and analyze them as one and by this commingling of accounts, purport to employ the lowest intermediate balance method of accounting. In other words, she manufactured the commingling. An honest analysis would separate out the LLC (which had the Changs' personal funds deposited into it) and the INC (which was the nonprofit funds). That is the first problem with her report, as discussed in greater detail below.

The second problem is that after artificially combining the two entities' various bank accounts, Agent Kikugawa employs the so-called Lowest Intermediate Balance Method (LIBM) as a foundation for her financial conclusions. While this is a type of accounting method used when dealing with commingled funds, Agent Kikugawa's application of the method is scientifically-unsound, given that she is the one

1  who manufactured the commingling of multiple accounts from multiple entities for purposes of her

2  analysis. As a result, her application of the methodology cannot meet the requirements of Fed. R. Evid.

3  702 and should be subject to a *Daubert* hearing.

4  The third problem with her report is that it appears to be based on hearsay far beyond the type

5  normally relied upon by experts and includes commentary and conclusory statements about the

6  "evidence." If Agent Kikugawa is to be engaging in a numbers-only financial analysis, rather than a

7  commentary on which allegations she believes to be true, then all portions of her report that comment on

8  matters other than a financial tracing such as emails and Mr. Chang's presumed state of mind, and the

9  intent of the donor, must be excised from the report and her testimony.

10  Finally, Agent Kikuguwa's purported tracing of property purchases is scientifically unsound,

11  speculative, and the result of her misapplication of the LIBM. As such, any of her conclusions regarding

12  the source of funds for property purchases should be excluded.

13  **II.    STATEMENT OF RELEVANT FACTS**

14  The parties exchanged and filed expert reports on July 3, 2019. The Government provided

15  defense counsel with Agent Kikugawa's FIR on July 3, 2019 and the accompanying exhibits on July 3

16  and July 8, 2019. See Exh. A (redacted FIR).[1] Agent Kikugawa's FIR purports to rely on bank

17  statements, interviews, tax returns, escrow statements, emails, the Seven Potential Frauds (subject of

18  Motion in Limine No. 1), legal correspondence between a law firm and TC Connection, S3G documents

19  and more. Her report focused on HOCA, Inc, HOCA, LLC, HOCCC, HOC4, IPilot, TC Connection,

20  VIA, S3G, Panda, FHL, the Changs and Cher Wang/Wenchi Chen.

21  **III.    ARGUMENT**

22  **A.  Legal Standard**

23  Federal Rule of Evidence 702 requires exclusion of expert testimony unless (1) the testimony is

24  based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods,

25  and (3) the proposed expert witness has applied the principles and method reliably to the facts of the

26  case. Fed. R. Evid. 702. The Court has a "gatekeeping function" to determine that proposed expert

27  testimony, whether based on scientific, technical or other "specialized knowledge" is both relevant and

28

---

[1] The full, unredacted FIR is being filed under seal, due to sensitive financial information.

DEFENDANTS' MOTION IN LIMINE NO. 3
Case No. 16-cr-00047 EJD                                                                                          2

reliable. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 597 (1993). Thus, the Court is "authorized and obligated to scrutinize carefully the reasoning and methodology underlying" expert testimony. *Claar v. Burlington R.R.*, 29 F.3d 499, 501 (9th Cir. 1994). Further, the party offering expert opinion testimony—in this case, the Government— must show that it meets the requirements of Rule 702 by a "preponderance of proof." *Daubert*, 509 U.S. at 592 n.10. In *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000), the Ninth Circuit outlined a series of factors the Court should consider when evaluating the admissibility of expert testimony:

- Whether the opinion is based on scientific, technical, or other specialized knowledge;

- Whether the expert's opinion would assist the trier of fact in understanding the evidence or determining a fact in issue;

- Whether the expert has appropriate qualifications-i.e., some special knowledge, skill, experience, training or education on that subject matter.

- Whether the testimony is relevant and reliable.

- Whether the methodology or technique the expert uses "fits" the conclusions (the expert's credibility is for the jury).

- Whether its probative value is substantially outweighed by the risk of unfair prejudice, confusion of issues, or undue consumption of time.

*Hankey*, 203 F.3d at 1168 (citations omitted). Importantly, where a witness is relying solely or primarily on her experience, she must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. See Fed. R. Evid. 702, Adv. Comm. Note (2000). Overall, an expert's testimony must be (1) relevant, and (2) reliable. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

Generally, the district court should focus on an expert's methodology rather than the conclusions it generates. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. However, an expert's conclusions are not immune from scrutiny: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1222 (10th Cir. 2000). Under *Daubert*, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology

1  or merely misapplies that methodology. It is critical that the district court determine whether the evidence

2  is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.*

3  (internal quotations and citations omitted). "A natural requirement of the gatekeeper function is the

4  creation of 'a sufficiently developed record in order to allow a determination of whether the district court

5  properly applied the relevant law.'" *Id.* at 1223 (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215

6  F.3d 1083, 1087 (10th Cir. 2000)); see also, *Dodge,*, 203 F.3d  1190, 1200 n. 12.

7         Finally, testimony may not be admitted if its probative value is substantially outweighed by any

8  prejudicial effect of permitting the evidence. Fed. R. Evid. 403. This is particularly important when

9  considering expert testimony because "[e]xpert evidence can be both powerful and quite misleading

10  because of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595. As a result, the Supreme Court

11  advised that a "judge in weighing possible prejudice against probative force under Rule 403 of the

12  present rules exercises more control over experts than over lay witnesses." *Id.* "Federal judges must

13  therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that

14  [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead

15  the jury." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995).

16  Agent Kikugawa's testimony is misleading and prejudicial because she misapplies the Lowest

17  Intermediate Balance Method of accounting.

18      **B.  Agent Kikugawa's Methodology is Unreliable and Misleading and Therefore, Inherently
19         Unreliable Under Rule 702 and Daubert.**

20         In *Attorney General of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 781 (10th Cir. 2009), in

21  concluding that the district court did not abuse its discretion in using a *Daubert* analysis to give no weight

22  to DNA testing results in that case, the Tenth Circuit did not focus on the reliability of PCR amplification

23  in the abstract, but instead on the fact that the district court's decision arose "out of the novelty of its

24  application to an entirely new area, which required the development of primers that had not been

25  identified previously. Thus, the court looked to other indications of reliability, including those enumerated

26  by the *Daubert* court, but could find none. . . . In addition, the record casts further doubt on Dr.

27  Harwood's methodology, suggesting other procedural flaws."

28         The Attorney General in that case argued "that *Daubert* should not have been used to assess the

application of the experts' methodologies, but rather should have been used to assess only the methodologies upon which the doctors relied." *Id.* at 779 (emphasis in original). The Tenth Circuit disagreed:

> It is an elusive process to divine the difference between a methodology and what constitutes a change from that methodology; therefore, under Daubert, we simply hold that "'any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir.1999) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (emphasis omitted)). . . .
>
> Moreover, when experts apply methodologies in novel ways, they may arrive at conclusions that result in "'too great an analytical gap between the data and the opinion proffered'" to be determined reliable. . . . (quoting *Joiner*, 522 U.S. at 147, 118 S.Ct. 512). In other words, as Tyson Foods argues, when experts employ established methods in their usual manner, a district court need not take issue under Daubert; however, where established methods are employed in new ways, a district court may require further indications of reliability.

Similarly, in this case, Defendants asserts flaws at numerous of the important steps in this case, which lead to unreliable results. Agent Kikugawa has not established that the commingling methodology she employed is a generally accepted practice in the scientific community. Her steps rendered what may be an otherwise reliable methodology into an unreliable analysis.

First, Agent Kikugawa uses no scientific studies to support any topic of her proffered testimony and offers no reliability to her use of the LIBM. While this is an *existing* accounting method, it is one that requires an understanding of the contributed amount of personal funds to an alleged commingled account; the assumption is that the personal funds that have been commingled with donor funds were spent first; and expenditures beyond the personal fund balance are then assumed to be traced to the donated (or non-personal) funds.[2] The LIBM of tracing has evolved from the equitable principals of trusts and is recognized in the Ninth Circuit. See *Republic Supply Co. of California v. Richfield Oil Co. of California*, 79 F.2d 375, 380 (9th Cir. 1935); *In re Dameron*, 155 F.3d 718, 724 (4th Cir. 1998) ("In cases where the trust property has been commingled, courts resolve the issue with reference to the so-called 'lowest intermediate balance' rule."). "The 'lowest intermediate balance method' assumes that the funds being traced are used by the account holder only after funds from other sources have been exhausted." *In re Brown Medical Center, Inc.* 2017 WL 8677359 (S.D. Texas 2017). Here, the "funds

---

[2] Agent Kikugawa does not appear to identify any personal funds and therefore, it is not conceivable how she can use the LIBM, which is dependent on the identification of personal funds.

being traced" are purportedly the donor and related funds. Accordingly, what is of grave importance to this method is the accurate reflection of what constitutes personal contributions. If the personal contributions are misclassified as donor (or ill-gotten), then the entire analysis will be wrong and the method will be faulty.

Here, the manner in which Agent Kikugawa applied the LIBM is scientifically unsound and disingenuous, as warned against in *Mitchell v. Gencorp*, *supra*. What she has done in her report and accompanying Exhibits 1, 2.1, 2.2, 2.3, 2.4, and 2.5 is combined INC and LLC income and outflows (from multiple bank accounts that were not commingled) and then purportedly applied the Lowest Intermediate Balance Method to the commingled "account" that she manufactured. *See* Attached Exh. B (exhibits).[3] This has resulted in a skewed picture of the finances because these two entities operate very differently, are structured differently, and the LLC has an influx of personal funds that appear to be ignored by Agent Kikugawa (or at a minimum, considered as non-personal). Where the opinion of an expert is based on erroneous assumptions of law or fact, the evidence is incompetent and insufficient to support a verdict. See *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 178 (9th Cir. 1950).

Indeed, Agent Kikugawa's conclusions and supposed "tracing" cannot stand because her underlying assumptions are baseless. She does not identify which deposit or withdrawal is attributable to which account in the six exhibits mentioned above and purports to trace the source of funds from this mixed pot.[4] She cannot manufacture the commingling, ignore the personal funds contributed (as described in greater detail below), and then claim the LIBM shows that "100% of the of the funds for the purchase of the first four properties were traced directly to donor or HOC4 funds, or earnings thereon; and $133,500 of funds for the purchase of the Havenside Drive property, or 35.8% was traced directly to donor or HOC4 funds, or earnings thereon." (FIR at p. 11). In particular, the conclusion regarding the Havenside Drive property is fundamentally flawed because the Agent misapplied the LIBM.

At a minimum, her methodology should be subject to a *Daubert* test.

//

//

---

[3] The un-redacted exhibits to the FIR at issue are being filed under seal, as they contain sensitive financial information.

[4] The FIR does include additional exhibits that are segregate by entity, but her application of the FIBM is dependent on the commingled funds (ie the spreadsheets in Exhibit B attached hereto).

1.   **If the Court Declines to Exclude Agent Kikugawa's Testimony and Her Application of the LIBM, a *Daubert* Hearing is Warranted.**

If the Court denies the Defendants' motion to exclude Agent Kikugawa's LIBM testimony and accompanying exhibits, it should at least hold a *Daubert* hearing regarding her opinions, qualifications, and methodology. Such a hearing is particularly important given the misleading nature of her analysis and the artificial blending of accounts. See *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (remanding for a *Daubert* hearing where there were "significant reliability questions raised by [an expert's] methodology").

C.   **Agent Kikugawa's Factual Assertions in the FIR are Matters for the Jury and the Inclusion of Hearsay Assertions Violates the Defendants' Right to Due Process and to Confront and Cross Examine the Evidence Against Them.**

While Rule 703 allows an expert to base opinions on facts that are otherwise inadmissible, including hearsay, so long as they are of a type "reasonably relied upon by experts in the particular field in forming opinions upon the subject." Fed. R. Evid. 703 (emphases added), an expert may not, however, simply re-transmit hearsay or other inadmissible evidence to the jury in the guise of expert opinion. Just because a statement is contained in an expert opinion does not render that statement admissible. Expert opinions are admissible only after an expert has "appl[ied] his extensive experience and a reliable methodology" to the otherwise inadmissible evidence to transform it into proper expert opinion. *United States v. Cerna*, No. CR 08-0730 WHA, 2010 U.S. Dist. LEXIS 146687, at *28 (N.D. Cal. Dec. 17, 2010), citing *United States v. Mejia,* 545 F.3d 179, 197 (2d Cir. 2008).

Agent Kikugawa's opinions on matters other than financial tracing such as donative intent or control are not the subject of a reliable methodology but would instead merely be the hearsay opinions of the interviewees and thus violate the defendants' rights to confront and cross-examine the witnesses against them in violation of *Crawford v. Washington*, 541 U.S. 36 (2004).

While Defendants do not contend that *Daubert* is overruled by *Crawford*, the Supreme Court's rejection of the prior reliability focus of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), for the traditional requirement of in-court cross examination restored by *Crawford*, should lead this Court to even more carefully examine the proposed expert testimony which goes far beyond a simple financial analysis and reads more like the government's opening statement.

The FIR begins on Page 5:

> JONATHAN used his position as an Elder at HOC 4 to solicit donations and a short term loan from a wealthy Taiwanese donor, Cher Wang. The donations and loan were meant for the use and benefit of HOC 4; however, they actually went to two separate entities controlled by and for the benefit of JONATHAN and WEILIN. JONATHAN further used his position as an Elder with HOC 4, as well as his relationship with Cher Wang, to transfer funds from HOC 4 bank accounts to an entity under his and WEILIN's control. He also used his position as Elder to divert regularly recurring monthly donations intended for HOC 4 to two separate entities under his and WEILIN's control.

The only portion of this introduction which is even remotely the proper subject of expert testimony is the phrase "they actually went to two separate entities… ."  The rest of this paragraph contains nothing but conclusions based on hearsay and is not an appropriate subject for expert testimony.

As the Seventh Circuit recognized in *United States v. Lawson*, 653 F.2d 299 (7th Cir. 1981), even before the Supreme Court decided *Crawford*, "the introduction of expert testimony based in large part on hearsay may raise serious constitutional problems if there is no adequate opportunity to cross-examine the witness." *Id*. at 301-303.  Although the *Lawson* court did not reverse because the specific facts underlying the opinions there were specified and disclosed, the conclusions Agent Kikugawa draws from interview reports here (including interviews of non-testifying witnesses), are not the type of "expert testimony" related to financial tracing that purports to be the objective of the report.

In *United States v. Dukagjini*, 326 F.3d 45, 59 (2nd Cir. 2003), the Second Circuit addressed a situation similar to the one here and found the proffered "expert" there, like the proposed report here: "plainly was not translating drug jargon, applying expert methodology, or relying on his general experience in law enforcement;" rather, he was relying on his conversations with non-testifying witnesses and co-defendants in order to prove "the truth of the matter asserted" about the meaning of the drug conversations" and held that the testimony should not have been admitted. *Id*. Although this is not a drug case, and she is not also a fact witness, Agent Kikugawa's observations regarding the intent of the donor and Jonathan Chang, who controlled what entity, and whether an entity was a "victim" are not typical subjects of expert methodology, but rather are questions of fact for the jury.

An expert witness should not usurp the jury's function of weighing evidence and making credibility determinations. *United States v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009). Throughout the FIR, Agent Kikugawa includes "facts" and opinions about the evidence, who is liable, who did what,

1   interprets emails, and presumes certain statements by government witnesses who were not present for the

2   events at issue to be true. She does not – as recommended in the advisory notes to Rule 702 – adequately

3   account for "obvious alternative explanations." See Fed. R. Evid. 702 advisory committee's notes to

4   2000 amendments.

5           While an expert opinion may be based on facts or data received before the hearing, the facts or

6   data must be of a type reasonably relied upon by experts in the particular field in forming opinions on the

7   subject. Fed. R. Evid. 703. Thus, while accounting software, certain methodologies, and reviews of bank

8   statements are the types of data commonly relied upon by accounting experts, emails, power point

9   presentations, and commentary by biased witnesses are not the type of data relied upon by experts.

10          No expert may offer an opinion or inference as to whether a criminal defendant did or did not

11   have the mental state or condition constituting an element of the charged crime or of a defense to the

12   crime. Fed. R. Evid 704(b); e.g., *United States v. Miner*, 774 F.3d 336, 349-50 (6th Cir. 2014) (holding

13   that IRS agent's testimony about defendant's intent was inadmissible under Rule 704).

14          The following are several excerpts from the FIR that do not belong in an expert report and

15   certainly should not form the basis of her opinions or relayed to a jury:

16   - "The donations and loan were meant for the use and benefit of HOC4." Pg. 5, FIR.

17      - This conclusion is one for the jury to make, not Agent Kikugawa.

18   - "He also used his position as an Elder to divert regularly recurring monthly donations
19     intended for HOC4 to two separate entities under his and Weilin's control." Pg. 5, FIR.

20      - Once again, this is a jury question as to whether he "diverted" funds.

21   - "Jonathan and Weilin are the sole owners and/or beneficiaries of HOCA, Inc." Pg. 8, FIR.

22      - This statement is simply untrue and skews the entire report.

23   - "Based upon review of interviews, members of HOC 4, including the bookkeeper,
        understood that HOCA, LLC and HOCA, Inc. were 'foundations' affiliated with the major
24      donor, WANG. WANG understood that HOCA, LLC and HOCA, Inc. were the same as
        and/or for the benefit of HOC 4." Pg. 9, FIR.

25      - This statement is highly inflammatory, subjective, and to be determined by a jury.

26   - "The members of HOC 4 were not aware that HOCA, LLC and HOCA, Inc. were holding
        over $5 million in donor funds, as well as funds belonging to HOC 4, for the purchase of
27      LOMITA." Pg. 11, FIR.

28      - Once again, what and if members were aware or not is a matter of opinion and part

1    of the jury's fact-finding mission.

2         Each of these matters and any other subjective commentary on the evidence beyond a simple

3    tracing of funds demonstrates that Agent Kikuguwa did not rely on a scientifically accepted

4    methodology, but that she premised her analysis on what amounts to gossip from certain HOC4

5    members. As a result, all such portions of her report should be stricken and her methodology and

6    opinions must be challenged in a *Daubert* hearing, as described above.

7    **D.  Agent Kikugawa Cannot Speculate as to the Source of Funds for the Property Purchases**

8         Because Agent Kikugawa misapplies the LIBM and artificially combines the transactions of the

9    two entities, her purported "tracing" of the source of funds for properties is fundamentally flawed,

10   inaccurate, and cannot stand. When she discusses the various properties, she does not actually trace

11   funds, but instead speculates in a deliberately misleading fashion.

12        For example, she purports to trace funds or speculate about the source of funds regarding the

13   purchase of Ruddy Duck Way. FIR at pg. 13. The report claims: "RUDDY DUCK was purchased in or

14   around July 2009 for approximately $355,000. The funds for the purchase came primarily from $341,028

15   wired from an account held by RuWu Charng at Taipei Fubon Bank in Taiwan. As indicated in the

16   Combined Source and Use of Funds, attached as Exhibit 1, HOCA, LLC/HOCA, Inc. transferred funds to

17   an account held by RuWu Charng at Hong Kong and Shanghai Banking Company in Taiwan."[5] *Id.*.

18        The intentionally deceptive report fails to mention that Exhibit 1 only purports to show

19   $177,632.00 transferred to RuWuCharng at Hong Kong and Shanghai Banking Company. Also troubling

20   is that the report does not trace funds from the Hong Kong and Shanghai Banking Company to the

21   account at Taipei Fubon Bank.[6] Assuming there is a connection between the Taipei Fubon account and

22   the Hong Kong and Shanghai Banking Company account, though there is no evidence of such a

23   connection, this purported "tracing" leaves $163,396 of the funds allegedly transferred from RuWu

24   Charng at Taipei Fubon Bank in Taiwan to purchase Ruddy Duck unaccounted for.

25        Unfazed by math, or the inability to trace funds, the report continues to speculate about the source

26

27   _____
     [5] Defendants are not aware of a Hong Kong and Shanghai Banking Company in *Taiwan*, so it is inexplicable where this
     information comes from.

28   [6] Indeed, Agent Kikugawa testified at the grand jury that she was not able to trace any funds that were transferred to Taiwan.
     February 4, 2016, GJ Transcript, at 8:3-5.

of funds for the purchase of PIPIT WAY. Claiming Pipit Way: "was purchased in or around December 2009 for approximately $270,000. The funds for the purchase, $271,045, were wired from an account held by RuWu Charng at Taipei Fubon Bank in Taiwan. As indicated in the Source and Use of Funds, attached as Exhibit 1, HOCA, LLC/HOCA, Inc. transferred funds to an account held by RuWu Charng at Hong Kong and Shanghai Banking Company in Taiwan." FIR at pg. 13.

First, as indicated above there is no connection between the account held by RuWu Charng at Hong Kong and Shanghai Banking Company (claimed to be in Taiwan?) and the account at Taipei Fubon bank in Taiwan. Second, the total transferred out of the United States to any foreign account is the $177,632.00 already claimed to be used for the purchase of the Ruddy Duck. Because all of the funds allegedly transferred to the RuWuCharng account at the Hong Kong and Shanghai Banking Company had been exhausted by the purchase of Ruddy Duck – according to Agent Kikugawa -- RuWuCharng had at least $434,441 of funds in China (the balance of the Ruddy Duck purchase and all of the Pipit Way purchase) not explained by alleged transfer from HOCA, LLC or HOCA, Inc. Therefore, the only conceivable reason Agent Kikugawa describes this property purchase is to imply a nefarious transaction. Such speculative commentary only serves the purpose of inappropriately prejudicing the jury.

The report goes on to describe the purchase of another property, Starland Drive, and again purports to trace the funds for that purchase to $1,042,750 ($1,000,000 and $42,750) wired from an account held by RuWu Charng at Taipei Fubon Bank in Taiwan. Agent Kikugawa again repeats the mantra that: "As indicated in the Source and Use of Funds, attached as Exhibit 1, HOCA, LLC/HOCA, Inc. transferred funds to an account held by RuWu Charng at Hong Kong and Shanghai Banking Company in Taiwan." FIR at pg. 13-14.

As described above, because all the funds transferred to the Hong Kong and Shanghai Banking Company had been exhausted by the purchase of Ruddy Duck, according to Kikugawa's "analysis," the report actually demonstrates that Jonathan Chang had at least $1,477,191 available at the time of the purchase of Starland Drive. Thus, it is highly unnecessary and misleading for Agent Kikugawa to cite to her Exhibit 1 at all, given absence of any tracing.

In sum, the Agent's purported "tracing" and calculations would not even pass as high school math, let alone qualify as a reliable analysis from a certified public accountant or forensic expert.

Accordingly, the FIR and the alleged "tracing" is nowhere near type of expert report designed to summarize and help jurors understand complicated facts, but is a misleading advocacy piece based on hearsay and should be excluded.

### E.  All Evidence Relating to Personal Property Purchases is Irrelevant and Should Be Excluded.

Without any reliable financial tracing that indicates properties were purchased with donor funds, all personal property purchases made by the Changs must be excluded. The properties at issue are:

   1.  6480 Havenside Drive, Sacramento, CA

   2.  9717 Ruddy Duck Way, Elk Grove, CA

   3.  9920 Pipit Way, Elk Grove, CA

   4.  3909 Starland Drive, La Canada Flintridge, CA

   5.  Marriott Time Shares

Jonathan and Weilin Chang purchased the above five properties for their own personal investments or use. The properties were purchased between 2009 and 2013. There is no evidence that the above-identified properties were purchased using any donor funds. As a result, these properties are not relevant to the instant case and should be excluded entirely from any testimony or evidence.

### 1.  The Five Properties Are Not Relevant and Should be Excluded as the Subject of Evidence or Testimony.

Only relevant evidence is admissible at trial. Fed. R. Evid. 401. How the Changs spent their personal assets is irrelevant to any of the causes of action. The government has not, and cannot, demonstrate that funds from S3 Graphics, Panda Networks, or Faith Hope and Love Foundation were used to purchase the five properties outlined above, though the government has arguably demonstrated that the Changs had at least $1,477,191 available to purchase property. As a result, it would cause undue prejudice, confusion to the jury and be a waste of time to admit any testimony or evidence relating to these five properties. Fed. R. Evid. 403. In other words, the prejudice is high to admit evidence of the purchase of these five properties, but the probative value is low. *Id.*

//

//

**2. The Government Cannot Speculate as to the Source of Funds for the Property Purchases**

In the event the Court does permit evidence relating to the four homes and one time share purchased by the Changs, the government should not be permitted to speculate as to the source of funds of those purchases. The FIR gives the defense a very real fear that the government may seek to argue or imply that the above-noted properties "must have been" purchased with donor funds, without any evidence or an actual financial accounting of how that may have occurred. Agent Kikugawa certainly does not provide the type of reliable and scientifically-accepted tracing method backed up by financial records showing the precise tracing of the donor funds into the property purchases. As a result, the government during the course of its argument and the government's witnesses through testimony must be precluded from speculating as to the source of funds for the property purchases.

**IV. CONCLUSION**

For the reasons stated, Defendants Jonathan and Weilin Chang respectfully request that the court exclude Agent Kikugawa's testimony as described herein. In the alternative, the Court should grant a *Daubert* hearing to explore her methodology. Finally, personal properties purchased by the Changs should be excluded from mention at trial.

Dated: July 11, 2019                                   Respectfully submitted,

                                               _____/s/_____

                                               Julia Jayne
                                               Christopher J. Cannon
                                               Matthew A. Laws
                                               Attorneys for JONATHAN & WEILIN CHANG